COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | § | |
|---|---|---|
| DANIEL PERALTA, | | No. 08-09-00006-CR |
| | § | |
| Appellant, | | Appeal from |
| | § | |
| v. | | 120th District Court |
| | § | |
| THE STATE OF TEXAS, | | of El Paso County, Texas |
| | § | |
| Appellee. | | (TC # 20070D03716) |
| | § | |

## **O P I N I O N**

We are again presented with a videotaped confession conducted in the Spanish language and the legal requirements for admitting the tape and an English translation. The procedures employed are critical because many jurors are fluent in Spanish and may interpret statements differently than a court interpreter or an official English translation. Even more problematic is the risk of Spanish-speaking jurors relating their own versions to other members of venire that speak only English. Today we strive to offer a protocol that will provide parallel consistency among the trial courts and allow the State and defense counsel to know what is expected. While the issue must occur routinely throughout Texas, it is most prevalent in border cities. Indeed, the two prominent decisions which have addressed the subject originated in Hidalgo County and El Paso County.

A jury found Daniel Peralta guilty of sexually assaulting his wife both anally and vaginally and assessed punishment of ten years' imprisonment together with a $10,000 fine. Upon jury recommendation, the court suspended the confinement and placed Appellant on community supervision. This appeal follows.

**FACTUAL SUMMARY**

On Monday, March 12, 2007, at 9:24 a.m., Appellant's wife, Sonia Peralta,[1] placed a 911 call from her neighbor's apartment. Sonia told the operator she had managed to get away from Appellant and needed help. Appellant had sexually assaulted her and threatened her with a knife; he would not let her leave or use the phone. Sonia described Appellant as a 45-year-old Hispanic male weighing approximately 180 pounds, with short black hair and last seen wearing a jean shirt, jeans, and a black cowboy hat. At trial, the 911 operator testified Sonia sounded scared and feared her husband was still outside and "going to get her." The operator entered all this information into the Computer Aided Dispatch (CAD), a system which allows officers to view the information from the computers in their vehicles. The audio recording and a transcript of the 911 call were admitted into evidence.

Officers were then dispatched to the location on a family disturbance call. Officer Chavez was the first on the scene and he proceeded to Maria Fonseca's apartment, where the 911 call had originated. He located Sonia and identified her as the caller. He described her as hysterical, shaken up, and crying. She blurted out "I was assaulted," and then told Officer Chavez her husband had sexually assaulted her over the two previous days.

When Officer Ojeda arrived a few minutes later, Chavez was still interviewing Sonia outside her friend's apartment. Ojeda also testified the woman was shaken up and crying. He heard her say, "He's going to kill me" and "he has a knife."

After speaking with the victim for five to ten minutes, the officers escorted her to her own apartment. She was reluctant to go inside because she feared Appellant was there and was "going to kill her." The officers convinced her to open her apartment and they established that Appellant was not inside. At this point, Officer Ojeda waited outside while Officer Chavez remained with the victim and continued to question her about the events which led to the 911 call. During that time,

---

[1] For clarity, we will refer to Daniel Peralta as Appellant and Sonia Peralta as Sonia.

Sonia broke down and cried again. Appellant had torn off her clothes and raped her in the bedroom. Officer Chavez noticed that her arms and neck were bruised. Sonia described how Appellant had grabbed her and bitten her. She felt pain and soreness in her buttocks and was having trouble walking and sitting down.

Sonia provided Officer Chavez with a description of her husband and his vehicle. Chavez relayed the information to Officer Ojeda who left the apartment complex to search for Appellant. The information included the make, model, and color of the car and a description of Appellant. After Ojeda left, Chavez put out a spot broadcast:

> [P]ossible aggravated sexual assault, subject used a pocketknife, might be in possession of a weapon; use caution; driving a primer old Camaro-type vehicle; was last seen within 10, 15 minutes of this location at this time; no other information.

Approximately five minutes later and just a few blocks away from the apartment complex, Officer Ojeda observed Appellant in a red Camaro. The car looked like the one Officer Chavez had described. Ojeda had also seen Appellant through the window. Based on the totality of the known facts and his own experience, Ojeda stopped the car. He identified Appellant by his driver's license. Ojeda then asked Appellant to step out of the vehicle and informed him he was under arrest for sexual assault. He read Appellant his rights and transported him to the Crimes Against Persons office (CAP).

Meanwhile, Officer Chavez accompanied Sonia to Sierra Medical Center where she was admitted for a rape analysis exam. Stacey Adams, the attending nurse, testified that Sonia reported Appellant had "repeatedly had sex with her against her will." Sonia had also reported that her husband accused her of cheating and, when she denied it, he forced himself on her both anally and vaginally multiple times throughout the night.

After Officer Ojeda escorted Appellant to the CAP office, Detective Chavarria sent him to

relieve Chavez at the hospital. Chavez then returned to the station to give his statement. Detective Chavarria informed Appellant of his *Miranda* rights for the second time and obtained his confession. Appellant's confession was conducted completely in Spanish.

In his confession, Appellant admitted to both the anal and vaginal rape of his wife. He described in detail the events of the two proceeding days. He admitted throwing his wife into a bedroom, forcibly removing her clothes, aggressively telling her to lay down on the bed, and penetrating her anally and vaginally. She was very scared and did not want to engage in sex. He knew he was hurting her but that he did it anyway because he was angry. Appellant also described a conversation whereby Sonia repeatedly told him she wanted him to let her go. He became enraged and decided to have sex with her "for the last time."

The confession was admitted into evidence. Both the audio and video portions of the tape were played for the jury. The written English translation was admitted and it was then read into the record with the prosecutor asking the questions and Officer Chavez reading the answers. Appellant's counsel objected to the introduction of the confession both in a pretrial suppression hearing and at trial.

Patricia Ortiz also testified for the prosecution. Ortiz is a friend of Sonia who works at the Peralta's apartment complex. She spoke with Sonia several times throughout the weekend in question. Sonia was afraid and crying because he wouldn't let her out. Appellant did not object to this testimony. The following exchange then took place:

Mr. Schultz: What did she tell you that Sunday morning?

Mr. Lucas: Objection, hearsay, Your Honor.

Mr. Schultz: She's emotional. She's afraid. She established that the thing she's afraid of had just recently happened. All the elements of excited utterance have been met.

Mr. Lucas: Your Honor, this is an interrogation going on from some conversation. There's nothing excited about it. There's nothing spontaneous about it. Classic hearsay.

The Court: Overruled. Go ahead.

Mr. Schultz: Thank you.

Q  (By Mr. Schultz):  What did she tell you?

A:  She had told me that she was afraid of him because he had gotten her through the back.

## SPANISH LANGUAGE VIDEOTAPED CONFESSION

Because of its significance, we begin with Issue Two in which Appellant challenges the admission of his videotaped confession. State's Exhibit 34 was the Spanish-language video. Exhibit 35 was a transcribed English translation of the video.  It was accompanied by a sworn affidavit detailing the interpreter's qualifications.  Both exhibits were admitted over Appellant's objections. On appeal, Appellant focuses his argument on the admission of the videotape itself.

Appellant argues that because the video was entirely in Spanish, it was error to play it to the jury without a qualified interpreter providing a contemporaneous translation either by simultaneous in-court translation or by embedding a translation into the video via subtitles.  The State responds the video was properly admitted since no contemporaneous translation was necessary and the video was properly authenticated.

A trial judge is afforded wide discretion in determining the adequacy of interpretive services. *Linton v. State*, 275 S.W.3d 493, 500 (Tex.Crim.App. 2009); *Flores v. State*, 299 S.W.3d 843, 855 (Tex.App.--El Paso 2009, pet. ref'd).  On appeal, the question is whether the services employed were constitutionally adequate, such that the defendant could understand and participate in the proceedings.  *Linton*, 275 S.W.3d at 500.  The issue is not whether the "best" interpretive services were employed.  *Id*.  The translation must be true or accurate, but need not be perfect.  *Id*. at 501-02.

An abuse of discretion standard is applied to determine whether the trial court erred. *Id*. at 502.

In support of his contention that a contemporaneous translation was required, Appellant directs us to *Leal v. State*, 782 S.W.2d 844 (Tex.Crim.App. 1989). There, the Court of Criminal Appeals determined that the admission of a recorded conversation in a foreign language is analogous to testimony by a non-English speaker such that the safeguards of Article 38.30 of the Code of Criminal Procedure apply. There was no testimony as to who actually translated the conversation. No one was positively identified as the translator in court and no one was sworn by the trial court as an interpreter. *Id*. at 847. Whoever the interpreter was, he or she was not called to the stand so the accuracy of the translation could be subjected to cross-examination. *Id*. at 849.

In a recent decision, we faced a similar argument. *Flores v. State*, 299 S.W.3d 843, 854 (Tex.App.--El Paso 2009, pet. ref'd). There, the defendant gave a videotaped confession primarily in Spanish and the State prepared a transcript of a sworn Spanish-to-English translation. *Id.* At trial, defense counsel objected, arguing the non-Spanish speaking jurors would read the translation as the video played and be unable to correlate the English statements with the context in which the defendant made them. *Id.* The trial court overruled the objections, and noted both the tape and the transcript would be available during deliberations if the jury needed to watch or read them again. *Id.* The opinion included the following rationale:

> The interpreter's rendition of the Appellant's statement created the only permanent record of what was said. It is as if the non-English language was never spoken before the jury and the interpreter stands in place of the witness. There is in fact no requirement or means available at trial to preserve the original foreign language spoken in court. It is the translation presented by the interpreter that creates the record and that ultimately serves as the basis for any potential appeal. In this case all the jurors should have been focused on the written translation and not on the Spanish audio.

*Id*. at 855-56. We explained that because the interpreter was positively identified, qualified,

officially sworn, and subjected to cross-examination, the requirements of Texas Code of Criminal Procedure, Article 38.30 were met. *Id.* at 856. We did not hold that Article 38.30 was the only method of authenticating such a translation. *Id.*

Neither *Leal* or *Flores* addresses the issue of whether the translations in those cases could have been properly authenticated in accordance with Rule 1009. *See* TEX.R.EVID. 1009. Rather, the cases merely stand for the notion that proper safeguards should be applied to ensure an accurate and reliable translation is provided to the jury. *See Leal*, 782 S.W.2d at 848-49; *Flores*, 299 S.W.3d at 856.

In most instances, there will be no reason for the jury to hear the Spanish audio and certainly that is preferable. *Flores*, 299 S.W.3d at 855. Physical positioning and proximity between the defendant and the interrogators will be visible. Body language will reveal whether the defendant was tired, dazed, sleepy, or otherwise compromised. Facial expression and demeanor will indicate whether the defendant was angry, serious, remorseful, laughing or smirking. Unless the defense claims verbal coercion or threatening tones of voice, the audio is unnecessary. Here, Appellant purportedly "insinuated" in voir dire that there was some sort of intimidation or fear.

We turn now to the translation. Article 38.30 requires:

**Art. 38.30.  Interpreter**

(a) When a motion for appointment of an interpreter is filed by any party or on motion of the court, in any criminal proceeding, it is determined that a person charged or a witness does not understand and speak the English language, an interpreter must be sworn to interpret for the person charged or the witness.

TEX.CODE CRIM.PROC.ANN. art. 38.30 (a)(Vernon Supp. 2010). We are also guided by the unified Texas Rules of Evidence. Article X relates to the contents of writings, recordings and photographs and Rule 1009 specifically addresses the translation of foreign language documents. Subsection (a)

provides that a translation of foreign language documents shall be admissible upon the affidavit of a qualified translator setting forth his or her qualifications and certifying that the translation is fair and accurate. The affidavit, along with the translation and the foreign language documents, shall be served upon all parties at least forty-five days prior to trial. Here, it is undisputed that defense counsel timely received the recording, the translation, and the sworn affidavit. The parameters of the grid translation are noteworthy. In three linear columns, the translator identified the speaker, the Spanish audio transcription, and the English translation.

Subsection (b) speaks to objections. Any party may object to the accuracy of another party's translation by pointing out the specific inaccuracies and stating with specificity what would constitute a fair and accurate translation. Objections must be served on all parties at least fifteen days prior to trial. No such objection was filed on behalf of Appellant.

There having been no timely objection, we look to subsection (c) which addresses the effect of a failure to object:

> **(c) Effect of Failure to Object or Offer Conflicting Translation.** If no conflicting translation or objection is timely served, the court shall admit a translation submitted under paragraph (a) without need of proof, provided however that the underlying foreign language documents are otherwise admissible under the Texas Rules of Evidence. Failure to serve a conflicting translation under paragraph (a) or failure to timely and properly object to the accuracy of a translation under paragraph (b) shall preclude a party from attacking or offering evidence contradicting the accuracy of such translation at trial.

In the event the time requirements of subsection (a) are not met, a party may nevertheless introduce the translation at trial either by live testimony or by deposition testimony of a qualified expert translator. TEX.R.EVID. 1009(e). Here, there was an identified, official translator with qualifications listed in a sworn affidavit. Although she was not called to testify, there is nothing in the record to indicate that she was not available to testify. Nor did Appellant object to her qualifications. He does

contend that the word "sworn" as used in Article 38.30 is a more stringent requirement than merely "certifying" that the translation is fair and accurate as required by Rule 1009(a). We need not address this distinction inasmuch as the affidavit here specifies, "Before me the undersigned authority, personally appeared Araceli Guevara,[2] who, *being by me duly sworn*, deposed as follows . . . ." [Emphasis added]. Clearly an oath was administered. We overrule Issue Two.

We pause now to offer some suggestions for admission of Spanish recordings. The proponent of the recording may rely on Article 38.30 and require that the interpreter be sworn, testify to her credentials, and certify that the translation is fair and accurate. Alternatively, the proponent may comply with Rule 1009(a). In that event, the proponent establishes admissibility if no objection is timely filed. In the event of conflicting translations served under Rule 1009(a) or if objections to another party's translation are served under Rule 1009(b), the trial court shall determine whether there is a genuine issue as to the accuracy of a material part of the translation to be resolved by the trial court. Although not required by subsection (a), better practices dictate that the supporting affidavit should (1) establish the translator's identity; (2) itemize his or her credentials in sufficient detail; (3) identify the document or recording being translated; (4) demonstrate that the translator has been administered an oath; and (5) certify that the translation is fair and accurate. We also recommend a limiting instruction similar to that given to the jury by the trial court below:

> Members of the jury, I just want to make sure. The purpose of showing you the video is not so that you-all can interpret it for yourself. There's going to be an official translation, and that will be the official translation. The purpose of the video is so that you can see the video and see what they were doing, the tone of voice, those kinds of things. You will have an official translation.

---

[2] Ms. Guevara is the same translator who was involved in *Flores*. *See Flores*, 299 S.W.3d at 854. In her affidavit in this case, she predicated her qualifications on the facts that she has been fluent in Spanish for fifty-three years, has been fluent in English for forty-three years, has written the Spanish language for fifty-one years, has written the English language for twenty-seven years, and has been translating documents for twelve years in connection with her affiliation with Border Language Services and its predecessors.

## EVIDENTIARY ERROR

## Denial of the Motion to Suppress

In Issue One, Appellant complains that his videotaped confession was not suppressed. He contends that the confession was obtained as the result of an illegal traffic stop in violation of the Fourth Amendment and was therefore fruit of the poisonous tree.

### *Standard of Review*

We review a trial court's ruling on a motion to suppress on the bifurcated standard of review articulated in *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App. 1997). *See Carmouche v. State*, 10 S.W.3d 323, 327 (Tex.Crim.App. 2000). At a suppression hearing, the trial judge is the sole trier of fact as to the credibility and weight to give witness testimony. *St. George v. State*, 237 S.W.3d 720, 725 (Tex.Crim.App. 2007). As such, the trial judge may choose to accept or reject any or all of the testimony offered. *Amador v. State*, 221 S.W.3d 666, 673 (Tex.Crim.App. 2007); *Gaines v. State*, 888 S.W.2d 504, 507-08 (Tex.App.--El Paso 1994, no pet.). We do not engage in our own factual review of the trial court's decision. *Garcia v. State*, 15 S.W.3d 533, 535 (Tex.Crim.App. 2000).

Almost total deference is given to a trial court's ruling on questions of historical fact and application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *Amador*, 221 S.W.3d at 673. We review *de novo* mixed questions of law and fact that do not turn on the credibility and demeanor of witnesses. *Id.*; *Guzman*, 955 S.W.2d at 88-89. Accordingly, we review *de novo* the trial court's application of legal principles to a specific set of facts, including the trial court's determination of reasonable suspicion. *Id.* When, as here, the trial court makes no explicit findings of fact, all evidence is viewed in the light most favorable to the trial court's ruling. *Carmouche*, 10 S.W.3d at 328; *Torres v. State*, 182 S.W.3d 899, 902 (Tex.Crim.App. 2005). Upon

review of the record, the trial court's ruling will stand so long as it is reasonably supported by the record and is correct under any theory of law applicable to the case. *State v. Dixon*, 206 S.W.3d 587, 590 (Tex.Crim.App. 2006).

*Applicable Law*

The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures. U.S. CONST. amend. IV. To the extent this argument applies to the Texas Constitution, it has not been briefed and error, if any, has been waived. *See* TEX.R.APP.P. 38.1(I); *Muniz v. State*, 851 S.W.2d 238, 251-52 (Tex.Crim.App. 1993). To make an investigatory stop of a vehicle an officer must have reasonable suspicion; *i.e.,* specific, articulable facts that, when combined with rational inferences from those facts and the officer's training, would lead an officer to believe that a person in the vehicle was, or is about to engage in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 20-21, 88 S.Ct. 1868, 1879-1880, 20 L.Ed.2d 889 (1968); *Ford v. State*, 158 S.W.3d 488, 492 (Tex.Crim.App. 2005). Temporary detention is lawful if based on reasonable suspicion that an individual is violating the law. *Ford*, 158 S.W.3d at 492. The reasonable suspicion determination disregards the subjective intent of the officer making the stop and instead looks solely to whether there was an objective basis for the stop. *Id*. When a police officer makes a stop without a warrant or consent, the State has the burden at a suppression hearing of proving the reasonableness of the stop. *Id*.

*Analysis*

Appellant's argument is limited to the legality of the traffic stop and not the warrantless arrest. He contends Officer Ojeda lacked reasonable suspicion because the color of his car did not match the color description in the spot broadcast; and no license plate or other vehicle identification numbers were known to the officer prior to effectuating the stop. The crux of the argument is that

Officer Ojeda stopped a *red* Camaro and the spot broadcast to police officers described the car as "a *primer*-old Camaro-type vehicle." Ojeda testified at the suppression hearing that Chavez described the car to him as being a red, older model Camaro. Chavez also advised him that: (1) an aggravated sexual assault had occurred; (2) a weapon was involved; (3) the suspect was the victim's husband; (4) the suspect was driving a red, older model, Camaro with unknown Texas plates; and (5) a description of the suspect's physical traits as well as his name, age, and date of birth. Upon receipt of the information Officer Ojeda left the scene to check for Appellant's vehicle in the area. He located Appellant a "couple of hundred yards away." After Officer Ojeda left the scene, Officer Chavez issued a spot broadcast to all officers stating there was a possible aggravated sexual assault; the suspect might be in possession of a weapon; use caution; driving a primer old Camaro-type vehicle; was last seen within ten to fifteen minutes at the apartment complex.

In essence, Appellant argues that based on the facts articulated at the suppression hearing, the State failed to prove, by a preponderance of the evidence, reasonable suspicion existed for the traffic stop. *See Ford*, 158 S.W.3d at 492. But the question before us is whether all of the information known to Officer Ojeda at the time of the stop supports a finding of reasonable suspicion. *Id*. at 492. Ojeda knew the color, make, and model of the car; the approximate time Appellant was last seen at the apartment complex; and the area in which Appellant was likely to be located.

The weight and credibility to give to such testimony is within the discretion of the trial court. *Garcia*, 15 S.W.3d at 535. Officer Ojeda testified that he knew the Camaro was red. Even if the trial court gave that statement little or no credibility, in light of all the information known at the time of the stop, the trial court could have reasonably concluded that reasonable suspicion existed. *See Dixon*, 206 S.W.3d at 590. Based on the totality of the circumstances, the record supports the trial

court's decision. *See id.* Finding no abuse of discretion, we overrule Issue One.

## **Hearsay Testimony**

In Issues Four and Five, Appellant complains of the admission of hearsay statements by two different witnesses under the excited utterance exception to the hearsay rule. Issue Four relates to various statements admitted via Officer Chavez's testimony. Issue Five relates specifically to three statements by Patricia Ortiz.

### *Standard of Review*

We review evidentiary matters for an abuse of discretion. *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex.Crim.App. 2003). An abuse of discretion exists when the trial court's decision is so clearly wrong that it lies outside the zone of reasonable disagreement. *Id.* Accordingly, the trial court abuses its discretion if its decision or action is arbitrary, unreasonable, and made without reference to any guiding rules or principles. *Id.*

### *Testimony of Officer Chavez*

Appellant first asserts that the trial court abused its discretion in finding that Sonia's statements to Officer Chavez qualified as excited utterances under Texas Rule of Evidence 803(2). He argues that the statements were made "at least two days" after the event; and that they were made not as spontaneous declarations, but as the result of questions he put to her. The State responds that Appellant did not preserve this issue for appeal because: (1) although Appellant objected initially, he failed to obtain a running objection; (2) Appellant failed to object when similar testimony was introduced by other witnesses; and (3) Appellant elicited the complained of testimony himself on cross examination.

Evidentiary error must be preserved by making a proper objection and securing a ruling on that objection. TEX.R.APP.P. 33.1(a); *Wilson v. State*, 71 S.W.3d 346, 349 (Tex.Crim.App. 2002).

A proper objection is one that is specific and timely. *Id.* With two exceptions, a party must continue to object each time inadmissible evidence is offered. *Ethington v. State*, 819 S.W.2d 854, 858 (Tex.Crim.App. 1991); *Gillum v. State*, 888 S.W.2d 281, 285 (Tex.App.--El Paso 1994, pet. ref'd). The two exceptions require counsel to either (1) obtain a running objection, or (2) request a hearing outside the presence of the jury. *Martinez v. State*, 98 S.W.3d 189, 193 (Tex.Crim.App. 2003). Evidentiary error is cured when the same evidence is admitted elsewhere without objection. *Leday v. State*, 983 S.W.2d 713, 718 (Tex.Crim.App. 1998); *Gillum*, 888 S.W.2d at 285. When not preserved, there is nothing for an appellate court to review. *Hudson*, 675 S.W.2d at 511.

While the record reveals several instances in which defense counsel made a timely, specific hearsay objection to a question asked by the State, he did not object to other questions which elicited the same or similar responses. Nor did counsel obtain a running objection or a court ruling outside the jury's presence. Indeed in his own confession, Appellant admitted virtually every fact to which Officer Chavez testified. The record also contains testimony of the other officers involved, Nurse Adams, and the 911 operator, along with medical reports and call records which address the same or substantially similar evidence. We overrule Issue Four.

*Testimony of Patricia Ortiz*

Next, Appellant claims the trial court abused its discretion in finding that Sonia's statements to Patricia Ortiz qualified as excited utterances under Rule 803(2). Specifically, he complains the following statements were inadmissible hearsay: (1) Sonia was being held hostage; (2) she was afraid of Appellant; and (3) Appellant forcefully penetrated his wife's anus.

We need not address the complaint as to the first two statements (testimony that Sonia told Ortiz she was being held hostage and that she was afraid of Appellant). Because Appellant failed to object, the issue has been waived. The only remaining issue relates to Sonia's statement that

Appellant had "gotten her through the back." Yet evidence of anal sexual assault was also admitted via testimony of Officer Chavez, Officer Ojeda, Nurse Adams, and Appellant's own confession. Because any error was harmless, we overrule Issue Five.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Defense counsel represented Appellant both at trial and on appeal. In Issue Three, counsel faults himself for failing to object to the introduction of the sixty-two page English translation of the videotaped confession on the grounds it was a hearsay document and should not have been admitted pursuant to Texas Rule of Evidence 1009. Both the United States and the Texas Constitution guarantee an accused the right to assistance of counsel. U.S. CONST. amend. VI; TEX.CONST. art. I, § 10; TEX.CODECRIM.PROC.ANN. art. 1.05 (Vernon 2005). This includes the right to reasonably effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 683-86, 104 S.Ct. 2052, 2062, 80 L.Ed.2d 674 (1984). In *Strickland*, the Supreme Court articulated the standard of review for evaluating claims of ineffective assistance of counsel. *Id.* at 687, 2064. The two-prong *Strickland* test requires Appellant to show that: (1) counsel's performance fell below an objective standard of reasonableness, and (2) counsel's performance prejudiced his defense. *Id.* Prejudice requires a showing that, but for counsel's unprofessional error, there is a reasonable probability that the result of the proceeding would have been different. *Id.*; *Mitchell v. State*, 68 S.W.3d 640, 642 (Tex.Crim.App. 2002); *Vasquez v. State*, 830 S.W.2d 948, 949 (Tex.Crim.App. 1992). Reasonable probability is defined as a "probability sufficient to undermine confidence in the outcome." *Stickland*, 466 U.S. 668 at 694, 104 S.Ct. 2052 at 2068.

Appellant bears the burden to prove ineffective assistance of counsel by a preponderance of the evidence. *Jackson v. State*, 973 S.W.2d 954, 956 (Tex.Crim.App. 1998). An ineffective assistance claim must be "firmly founded in the record," and "the record must affirmatively

demonstrate" the meritorious nature of the claim. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex.Crim.App. 1999). Generally, isolated failures to object to improper evidence do not constitute ineffective assistance of counsel. *Ingham v. State*, 679 S.W.2d 503, 509 (Tex.Crim.App. 1984). Further, Appellant is not entitled to errorless representation or competency of counsel which is judged by hindsight. *Calderon v. State*, 950 S.W.2d 121, 126 (Tex.App.--El Paso 1997, no pet.).

In analyzing a claim for ineffective assistance, we begin with the strong presumption that counsel was competent. *Thompson*, 9 S.W.3d at 813. Appellant must overcome the presumption that counsel's conduct falls within the wide range of reasonable, professional assistance, and that, under the circumstances, the challenged action might be considered sound trial strategy. *Jackson v. State*, 877 S.W.2d 768, 771 (Tex.Crim.App. 1994). Counsel's action or inaction will be found to be reasonable if the record is silent as to the facts, circumstances, or rationale behind a particular course of action. *Thompson*, 9 S.W.3d at 814.

Counsel objected to the translation on the grounds that it violated the optional completeness rule, and that it was proffered without any in-court testimony by the person who translated the videotape to show she was certified to translate the conversation. He did not object on hearsay grounds. The State counters that Appellant's contention lacks merit as the document was admissible as a "non-hearsay" admission by a party-opponent and the translation was properly admitted under Rule 1009.

The determination regarding whether a defendant received effective assistance of counsel must be made according to the facts of each case. *Thompson*, 9 S.W.3d at 812. An appellate court looks to the totality of the representation and the particular circumstances of the case in evaluating counsel's effectiveness. *Id*. In the majority of instances, an appellant cannot rebut the presumption of reasonable assistance, because the record on direct appeal is simply undeveloped and does not

adequately reflect the alleged failings of trial counsel. *Id*. at 813-14. A silent record that provides no explanation for counsel's actions will not ordinarily overcome the strong presumption of reasonable assistance. *See Rylander v. State*, 101 S.W.3d 107, 110-11 (Tex.Crim.App. 2003). Any error in trial strategy will be deemed inadequate representation only if counsel's actions are without any plausible basis. *Id*.

Here, Appellant filed a motion for new trial which alleged generally that the evidence was factually insufficient to support the jury's finding. Because he did not raise the issue of ineffective assistance in his motion for a new trial, the record is silent on this issue. *Rylander*, 101 S.W.3d at 110-11. Based on the record presented, we conclude Appellant has failed to overcome the presumption of reasonableness. *See id; Thompson*, 9 S.W.3d at 812. More importantly, we have concluded that admission was proper pursuant to Rule 1009. We overrule Issue Three and affirm the judgment of the trial court.

November 30, 2010

ANN CRAWFORD McCLURE, Justice

Before McClure, J., Rivera, J., and Antcliff, Judge
Antcliff, Judge, sitting by assignment

(Publish)

## CONCURRING OPINION

I concur but write separately to express my concern with trial court decisions to play the audio of a videotape in a foreign language. Proceedings are to be conducted in the English language. *See Garcia v. State*, 210 S.W.2d 574, 601 (Tex.Crim.App. 1948). Indeed, notice of charges for crimes committed by a person against the laws of the State are in English, *see id*., and we qualify jurors to serve on the basis of whether they can read and write the English language. *See Sayyadi*

*v. State*, 40 S.W.3d 722, 722 (Tex.App.--Austin 2001, no pet.). When necessary, we provide interpreters for defendants or witnesses who speak languages other English. *See* TEX.CODE CRIM.PROC.ANN. art. 38.30 (Vernon Supp. 2010). Due process, at a minimum, requires that. *Pineda v. State*, 176 S.W.3d 244, 247 (Tex.App.--Houston [1st Dist.] 2004, pet. ref'd).

Similarly, recordings of conversations in foreign languages are routinely translated into English prior to their admission at trial. In fact, this method of translation is preferable to the live, contemporaneous translation where the opportunity for error and lack of opportunity to object are greater. However, once the trial court admits the translation, the trial court, in essence, has determined what the videotape said, and it is solely the role of the jurors to decide what weight to attach to that evidence. Indeed, the trial court is the gatekeeper of the evidence at a trial. It decides what evidence to admit, whereas the fact finder decides what weight should be attached to that evidence. When, as here, the trial court admits a translation of a foreign language into evidence, that translated rendition becomes the only permanent record of what was said. *Flores v. State*, 299 S.W.3d 843, 855 (Tex.App.--El Paso 2009, pet. ref'd). The words spoken in the foreign language are as if they were never spoken before the jury. *Id*.

Playing the audio recordings in their original form, however, may be helpful to the jury in judging the tone and demeanor of the persons speaking thereon. But I caution that if those recordings are played along with the limiting, contemporaneous instruction as given here, a further instruction in the charge should be given, noting that the jury may only listen to the audio for purposes of determining tone and demeanor of those speaking on the recording, which goes to the weight and credibility to be attached to such evidence. The instructions should further provide that the jurors, who may also speak the same language as exhibited on the recording, should not be allowed to engage in their own interpretation of the words spoken but rather must accept the

translated rendition of the foreign language as provided by the trial court. Failure to give such instructions could disrupt the trial court's role as the gatekeeper of the evidence and allow the jury to make its own translation of the foreign language, which they cannot do.

With these comments, I concur.


November 30, 2010

GUADALUPE RIVERA, Justice